UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| B.C., D.H., and R.O.,<br><br>Plaintiffs,<br><br>v.<br><br>TRAVEL LODGE OLD NATIONAL, LLC, LEXICON HOSPITALITY, LLC, and LEXICON HOSPITALITY INVESTMENTS, LLC,<br><br>Defendants. | CIVIL ACTION FILE<br><br>NO.<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

1.

B.C., D.H., and R.O. were trafficked for sex as children at the Travelodge located at 2471 Old National Highway, College Park, Georgia 30349. B.C. was fourteen years old when her trafficking began in 2011; D.H. was fifteen years old when her trafficking began in 2015; and R.O. was fifteen years old when her trafficking began in 2016. Given the nature of the case, Plaintiffs are identified in this Complaint by their initials. Plaintiffs' counsel will disclose their full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

[1] Contemporaneously with this Complaint, Plaintiffs filed a Motion for Protective Order and Leave to Proceed Anonymously because the allegations in the Complaint,

2.

Defendant Travel Lodge Old National, LLC ("TLON") is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard F. Evins, 420 Ridgecrest Road, LaGrange, Georgia 30240.

3.

TLON has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to TLON.

5.

Defendant Lexicon Hospitality, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 406 Ridley Avenue, LaGrange, Georgia 30240.

6.

Defendant Lexicon Hospitality, LLC has been properly served with process in this action.

---

which include child sex trafficking, are intimate and personal in nature and raise concerns for Plaintiffs' personal safety.

7.

Jurisdiction and venue are proper as to Defendant Lexicon Hospitality, LLC.

8.

Defendant Lexicon Hospitality Investments, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 406 Ridley Avenue, LaGrange, Georgia 30240.

9.

Defendant Lexicon Hospitality Investments, LLC has been properly served with process in this action.

10.

Jurisdiction and venue are proper as to Defendant Lexicon Hospitality Investments, LLC.

11.

At all times herein, Defendants jointly owned, operated, maintained, controlled, managed, and/or were responsible for securing the Travelodge, from which they benefited financially.

12.

At all times relevant hereto, Defendants owned, operated, maintained, controlled, and managed the Travelodge as a joint venture, sharing valuable information,

data, responsibilities, and financial benefits from the motel's operation, and each having rights of mutual control over the motel and each other.

13.

Any distinctions between Defendants are on paper only. In reality, the three Defendants shared employees, finances, and responsibilities for the operation of the Travelodge. Defendant TLON is ostensibly the landowner, but is wholly controlled by its sole member, Defendant Lexicon Hospitality Investments, which conducts all the business of Defendant TLON. Defendant Lexicon Hospitality has long advertised its own involvement in operating the Travelodge.[2]

14.

Defendants shared assets, money, employees, office locations, board members, entered into contracts with each other without consideration, had employees of one company conduct the business of other companies, and generally ignored the corporate forms that are the hallmark of separate entities.

15.

For the purposes of owning, operating, and managing the Travelodge, during the relevant time, Defendants functioned as a single entity and exercised control jointly over the motel and over each other.

---

[2] LEXICON HOSPITALITY, lexicon-hospitality.com; WAYBACK MACHINE (Jan. 27, 2020), https://web.archive.org/web/20200127185504/http://lexicon-hospitality.com/.

16.

Defendants knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiffs' trafficking. Defendants knew because:

(a) Defendants knew about Plaintiffs while they were sold for sex at the Travelodge;

(b) Defendants' employees knew of and permitted sex trafficking and prostitution to occur at the Travelodge;

(c) Defendants knew about several other sex trafficking victims at the Travelodge before, during, and after Plaintiffs;

(d) Defendants knew about frequent and similar crimes occurring at the Travelodge;

(e) Defendants knew about the reports of Travelodge guests regarding sex trafficking and prostitution-related activities; and

(f) Defendants had knowledge of sex trafficking generally in the Atlanta area and at the Travelodge specifically.

17.

A person under the age of eighteen cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of

whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

18.

Sex trafficking and prostitution were common occurrences at the Travelodge and Defendants chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendants are liable to Plaintiffs for their actions and failure to act. Defendants' liability to Plaintiffs is straightforward:

(a) The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person ***knew or should have known*** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendants knowingly benefited from participation in a venture that they knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendants (i) rented a room to Plaintiffs D.H. and R.O.'s respective traffickers so D.H. and R.O. could be violently sold for sex at the hotel, and (ii) did so despite what they knew or should have known about Plaintiffs D.H. and R.O. being victims of sex trafficking at the hotel.

As a result of Defendants' conduct, Plaintiffs suffered physical and mental harms, and Defendants are liable to Plaintiffs for the damages arising from those harms under the TVPRA.

(b) Because Plaintiffs D.H. and R.O. were children when they were trafficked at the Travelodge, and because Defendants knowingly facilitated their trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to Plaintiffs for the substantive violation of 18 U.S.C. § 1591.

(c) The Travelodge constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drug use, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiffs B.C., D.H., and R.O. were sold for sex at the Travelodge, causing them substantial harm.

19.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants at the Travelodge.

## I. B.C.'s trafficking at the Travelodge.

20.

In the fall of 2011, until November 2011, when she was only fourteen years old, B.C. was illegally harbored, falsely imprisoned, and sold for child sex at the Travelodge. B.C.'s traffickers took her to the Travelodge because they knew it would be a good place to sell B.C. for sex.

21.

B.C. was sold for sex on the backside of the Travelodge property, where sex trafficking victims were intentionally placed by Defendants to keep them out of public view. By intentionally placing B.C. in the rear of the hotel, Defendants concealed B.C.'s traffickers' operation and minimized their risk of detection.

22.

B.C. was trafficked at the Travelodge by violent traffickers. She was made to have sex with 10 to 20 men a day. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

23.

While at the Travelodge, B.C. was forced to perform sex acts alongside other children who were also being sold out of the hotel. These dates were called "two-girl specials."

24.

B.C.'s traffickers also sold drugs out of the room, which brought even more people in and out of the room throughout the day.

25.

In addition to being sold for sex to buyers, one of B.C.'s traffickers also forced her to have sex with him.

26.

Employees of the Travelodge were familiar with and accommodated B.C.'s traffickers and their sex trafficking operation. Hotel staff, including housekeepers and maintenance workers, referred to one of B.C.'s traffickers by his street name, "Goldie," which signaled a level of familiarity and rapport that went beyond mere recognition.

27.

The housekeepers and maintenance employees often hung out with one of B.C.'s traffickers in the room B.C. was being trafficked in. Sometimes, when the employees stopped by, the trafficker would tell them, "We're working right now," and that he'd catch up with them later. On those occasions, B.C. was dressed in the revealing, sexually overt outfits her traffickers required her to wear with buyers.

28.

B.C. encountered housekeeping staff on a daily basis. While cleaning the room B.C. was trafficked in, housekeeping found trash cans filled with condoms, boxes of condoms, lube, crack pipes, and other paraphernalia indicating sex trafficking and drug use were occurring in the room. Defendants knew or should have known that these signs, among others, were signs of B.C.'s trafficking at the Travelodge.

29.

On a regular basis, Defendants' employees knowingly removed and disposed of evidence of trafficking from the traffickers' room. This destruction of evidence was carried out in coordination with or for the benefit of the traffickers, with the effect of hindering a potential investigation into B.C.'s trafficking.

30.

A housekeeper regularly spoke with B.C. while cleaning the room out of which B.C. was trafficked. These conversations often occurred while B.C. was wearing the type of clothing her traffickers required her to wear with buyers of sex: revealing bodysuits or miniskirts and tops that exposed her nipples. The housekeeper said things to B.C. like "you're too pretty to be outside like this" and "stop revealing yourself to men."

31.

On one occasion, that same housekeeper entered the room after B.C. and another child had just finished a date. The two children were undressed and were discussing the date they had just had as the housekeeper cleaned the room around them.

32.

Throughout her trafficking, B.C. regularly went to the front desk to get towels and tissues.

33.

Once, B.C. tried to check in to the hotel with a fake identification that her trafficker had provided her with. The front desk employee told B.C. that the identification did not look like her and refused to check her in. One of her traffickers then approached the front desk and was allowed to book a room for himself and the minor B.C. without issue.

34.

While she was trafficked at the Travelodge, B.C. exhibited visible signs of a child sex trafficking victim which Defendants knew or should have known. These signs were exhibited in the Travelodge’s common areas and included her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of B.C. by her traffickers.

35.

B.C. was required to walk in the area around the Travelodge to meet sex buyers, often walking directly in front of the front office while wearing revealing and overtly sexual clothing.

36.

B.C.'s traffickers were physically violent toward her on a regular basis. On one occasion, she was repeatedly struck by one trafficker with a hairbrush on her exposed buttocks and then forced back outside to continue soliciting sex buyers.

37.

B.C. attempted to flee her traffickers while at the Travelodge. One of the traffickers spotted her, and she screamed for help loudly enough to be heard throughout the property. Rather than intervening, neither bystanders nor Travelodge employees did anything to help B.C. as her trafficker physically dragged her back up the stairs and into the room.

38.

Illegal activity at the Travelodge was pervasive. More than ten other girls were being sold for sex at the property during B.C.'s trafficking, all of whom were children or appeared to be near B.C.'s age. These children wore skimpy clothes throughout the hotel parking lot, and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children

for short periods of time before leaving and being followed by other anonymous men.

39.

B.C. and other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Often, these women and children could be seen loitering around the hotel soliciting buyers of sex. Defendants knew or should have known that these were signs of sex trafficking at their hotel.

40.

Defendants knew or should have known that B.C. was being trafficked based on these signs and activities.

41.

Defendants had a policy not to call the police regarding known or suspected sex trafficking at the Travelodge. Defendants followed this policy in the case of B.C. as well as other sex-trafficking victims because the hotel never once reported or encouraged others to report these activities at the property.

42.

One of B.C.'s traffickers was subsequently arrested and prosecuted for his trafficking of B.C. at the Travelodge. He pleaded guilty to two counts of Trafficking a Person for Sexual Service, Simple Battery, Pimping, Statutory Rape, False

Imprisonment, Pandering, Child Molestation, and Enticing a Child for Indecent Purposes, among others.

43.

Milinda Price-Savannah, whose declaration is attached to this Complaint,[3] served as the general manager of the Travelodge from 2011 through approximately 2013. Price-Savannah was subpoenaed to testify at the criminal trial of B.C.'s trafficker on behalf of Travelodge and did, in fact, testify.

44.

Defendants maintained a policy or practice of allowing and facilitating trafficking at the Travelodge, including the trafficking of B.C. This policy was implemented, in part, by agreeing to house B.C.'s traffickers' ventures, associates, and victims and knowingly placing B.C. in the back of the Travelodge, concealing her sex trafficking and protecting her traffickers from detection. Additionally, Defendants knowingly and actively disposed of and destroyed physical evidence of B.C.'s trafficking for her traffickers, protecting them from potential investigation by the police.

---

[3] *See* Ex. 1, Milinda Price-Savannah Declaration.

## II. D.H.'s trafficking at the Travelodge.

45.

Between May and September 2015, when she was only fifteen years old, D.H. was illegally harbored, falsely imprisoned, and sold for child sex at the Travelodge. D.H.'s trafficker took her to the Travelodge because she knew it would be a good place to sell D.H. for sex.

46.

D.H. was sold for sex out of the back building on the Travelodge property, where sex trafficking victims were intentionally placed by Defendants to keep them out of public view. By intentionally placing D.H. in the rear of the hotel, Defendants concealed D.H.'s trafficker's operation and minimized their risk of detection.

47.

While D.H. was trafficked at the Travelodge, she was made to have child sex with over 10 men each day. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

48.

When D.H. told her trafficker she didn't want to have sex with any more dates, the trafficker beat D.H. and forced her to keep seeing them anyway. These were

severe beatings, and the injuries were often visible on her body as she walked around the hotel.

49.

When a buyer arrived to purchase D.H. for sex, D.H.'s trafficker would leave the room and wait on the balcony or in a friend's room and return immediately after the buyer left. If the encounter lasted longer than the buyer had paid for, the trafficker would knock on the door.

50.

Defendants had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendants followed this policy in the case of D.H. as well as other sex-trafficking victims.

51.

Employees of the Travelodge were familiar with and accommodated D.H.'s trafficker and her sex trafficking operation. Hotel staff, including a female employee who worked at the front desk and who was regularly present during D.H.'s trafficking, referred to her trafficker by her street name, "Shay," which signaled a level of familiarity and rapport that went beyond mere recognition.

52.

On one occasion, a member of D.H.'s family came to the Travelodge looking for D.H. At the direction of D.H.'s trafficker, Defendants relocated D.H. to a

different room in the back building of the hotel. Defendants' employees then told D.H.'s family member that D.H. was no longer staying at the hotel, despite knowing that she remained on the property.

53.

Housekeeping came to D.H.'s room approximately every two to three days. During these visits, D.H.'s trafficker handed housekeeping used towels, trash, and other items from the room. The trash contained numerous used condoms and condom wrappers. D.H. was present during these encounters, and housekeeping could see D.H. dressed in revealing clothing inside the room. Defendants knew or should have known these signs, among others, indicated that D.H. was being trafficked at the Travelodge.

54.

Inside the room, Defendants found trash cans filled with used condoms, boxes of condoms, lube, and other paraphernalia indicating sex trafficking was occurring in the room.

55.

On a regular basis, Defendants' employees knowingly removed and disposed of evidence of trafficking from the trafficker's room. This destruction of evidence was carried out in coordination with or for the benefit of the trafficker, with the effect of hindering any potential investigation into D.H.'s trafficking.

56.

While she was trafficked at the Travelodge, D.H. exhibited visible signs of a child sex trafficking victim which Defendants knew or should have known. These signs were exhibited in the Travelodge's common areas and included her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of D.H. by her trafficker.

57.

Illegal activity at the Travelodge was pervasive. D.H. saw many other girls and women who were obviously being sold for sex at the hotel. These women and children wore skimpy clothes throughout the hotel parking lot, and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

58.

D.H. observed people having sex in the Travelodge parking lot. D.H. also saw used condoms in the parking lot.

59.

D.H. and other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Often, these women and children could be seen loitering around the hotel soliciting buyers

of sex. Defendants knew or should have known that these were signs of sex trafficking at their hotel.

60.

Defendants knew or should have known that D.H. was being trafficked based on these signs and behaviors.

61.

D.H. regularly heard sounds of sexual activity, loud music, shouting, and arguments in and around the Travelodge.

62.

Defendants maintained a policy or practice of allowing and facilitating sex trafficking at the Travelodge, including the trafficking of D.H. This policy was implemented, in part, by agreeing to house D.H.'s trafficker's trafficking ventures, associates, and victims, and by knowingly placing D.H. on the backside of the motel, concealing her sex trafficking and protecting her trafficker from detection. Additionally, Defendants knowingly and actively disposed of and destroyed physical evidence of D.H.'s trafficking for her trafficker, protecting her from potential investigation by the police.

## III. R.O.'s trafficking at the Travelodge.

63.

From approximately February 2–4, 2016, when she was only fifteen years old, R.O. was illegally harbored, falsely imprisoned, and sold for child sex at the Travelodge. R.O.'s traffickers took her to the Travelodge because they knew it would be a good place to sell R.O. for sex.

64.

The traffickers, from out of state, identified the best place to sell a minor child for sex through online searches for terms such as "Atlantaprostitutionblock," "best prostitute in Atlanta," and "where is Atlanta Prostitution." These searches led them to the Travelodge.

65.

R.O.'s traffickers paid for the room in cash each day. R.O. sometimes accompanied her traffickers to the front office when they paid for the room.

66.

R.O. was sold for sex out of the back building on the Travelodge property, where sex trafficking victims were intentionally placed by Defendants to keep them out of public view. By intentionally placing R.O. in the rear of the hotel, Defendants concealed R.O.'s traffickers' operation and minimized their risk of detection.

67.

Once, R.O. went to the front desk to request towels. Staff told R.O. she could not have towels because she was not the person who had checked into the room, and that she needed to return with the individual whose name was on the reservation. R.O. returned to the front desk with her older male trafficker. During this interaction, R.O. was wearing the type of clothing her traffickers required her to wear with buyers of sex: revealing, see-through lingerie-type outfits. Defendants knew or should have known that a child, dressed in sexually explicit clothing, asking for towels, accompanied by an older man, was a sign of child sex trafficking.

68.

While at the Travelodge, R.O. was made to have sex with roughly 5 men. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

69.

When a buyer arrived to purchase R.O. for sex, R.O.'s traffickers would leave the room and wait in their car in the parking lot, returning as soon as the buyer left.

70.

R.O.'s traffickers were also selling sex out of the room at the Travelodge.

71.

Over the course of twenty-four to forty-eight hours, approximately 8 men entered and exited R.O.'s room at the Travelodge: R.O.'s traffickers, the 5 men who purchased sex from R.O., and the 2 men who purchased sex from one of her traffickers. Defendants knew or should have known that the frequent, older-male visitors to the room were clearly indicative of sex trafficking.

72.

Housekeeping entered the room where R.O. was being trafficked to clean it. The trash cans were filled with used condoms. On the nightstand, an assortment of condoms, lubricants, and sex toys was laid out as a display. The men who purchased R.O. for child sex chose which condom and sex toy they wanted to use. Defendants knew or should have known that these signs, among others, were signs of R.O.'s trafficking at the Travelodge.

73.

Defendants' employees knowingly removed and disposed of evidence of trafficking from R.O.'s room. This destruction of evidence was carried out in coordination with or for the benefit of the traffickers, with the effect of hindering a potential investigation into R.O.'s trafficking.

74.

While she was trafficked at the Travelodge, R.O. exhibited visible signs of a child sex trafficking victim which Defendants knew or should have known. These signs were exhibited in the Travelodge's common areas and included her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of R.O. by her traffickers.

75.

Defendants knew or should have known that R.O. was being trafficked based on these signs and activities.

76.

Illegal activity at the Travelodge was pervasive. More than 10 other women and children were being sold for sex at the property during R.O.'s trafficking. These children wore skimpy clothes throughout the hotel parking lot, and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

77.

Defendants had a policy not to call the police regarding known or suspected sex trafficking at the Travelodge. Defendants followed this policy in the case of R.O.

as well as other sex-trafficking victims because the hotel never once reported or encouraged others to report these activities at the property.

78.

R.O. was rescued on February 4, 2016. R.O.'s traffickers were subsequently arrested and prosecuted for their trafficking of R.O. at the Travelodge. Both traffickers pleaded guilty to state charges of Trafficking a Person for Sexual Servitude, Pimping (Person Under 18 Years of Age), Pandering (Person Under 18), Interstate Interference with Custody, and Contributing to Delinquency of a Minor. They also each pleaded guilty to the federal charge of Transporting of Minor with Intent to Commit Criminal Sex Act.

79.

Defendants maintained a policy or practice of allowing and facilitating trafficking at the Travelodge, including the trafficking of R.O. This policy was implemented, in part, by agreeing to house R.O.'s traffickers' ventures, associates, and victims and knowingly placing R.O. in the back of the Travelodge, concealing her sex trafficking and protecting her traffickers from detection. Additionally, Defendants knowingly and actively disposed of and destroyed physical evidence of R.O.'s trafficking for her traffickers, protecting them from potential investigation by the police.

## IV. Defendants' knowledge of crime at the Travelodge.

80.

The Travelodge had a well-established reputation for criminal activity, including prostitution and sex trafficking.

81.

Defendants owned and operated the Travelodge and employed the employees there, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during their period of ownership.

82.

The back of the hotel had constant activity, with buyers of commercial sex coming and going from multiple hotel rooms after staying for short periods.

83.

Before, during, and after Plaintiffs' child sex trafficking at the Travelodge, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

84.

Beginning in 2011, another child, D.B., was trafficked for sex at the Travelodge when she was just thirteen years old.

85.

Beginning in 2012, another child, J.S., was trafficked for sex at the Travelodge when she was just fourteen years old.

86.

Ms. Price-Savannah served as general manager of the Travelodge from approximately 2011 through 2013 and lived on the property during that period.

87.

Price-Savannah observed women and young girls at the Travelodge whom she believed were being sold for sex. She estimates that, at any given time, approximately fifteen to twenty rooms were being used for prostitution or sex trafficking.

88.

Price-Savannah observed at least ten pimps operating out of the hotel at any given time, some controlling as many as five girls from a single room. According to Price-Savannah, the girls being controlled by pimps were readily identifiable because the pimps exercised obvious control over them. The girls being controlled by pimps frequently avoided eye contact, kept their heads down, and were reluctant to speak when their pimps were nearby.

89.

According to Price-Savannah, the pimps would loiter around outside the rooms when the girls were being purchased for sex.

90.

Price-Savannah was able to identify girls whom she believed were underage based on their appearance and demeanor. Many girls appeared noticeably young and seemed as though they were "playing dress-up." She observed that some struggled to walk in high heels, often wobbling or appearing unsteady while moving about the property.

91.

Price-Savannah estimates that there were easily one hundred men who came to the Travelodge each day to purchase women and young girls for sex.

92.

Price-Savannah repeatedly reported prostitution and suspected sex trafficking at the Travelodge to the hotel's owners and repeatedly urged them to visit the property and observe the activity for themselves. The owners refused to stay at the hotel, declined to investigate the activity she reported, and took no meaningful steps to address it. Instead, the owners instructed Price-Savannah that she could not take any action to stop the prostitution and sex trafficking activity at the Travelodge so long as the individuals involved continued paying for their rooms.

93.

Price-Savannah obtained anti-trafficking materials from nonprofit organizations, including soap containing trafficking hotline information, and placed those

materials in guest rooms. She states that after Defendants learned of those efforts, they instructed her to remove the materials from the property.

94.

The owner visited the Travelodge roughly every other month and toured the hotel with Price-Savannah during those visits. The owner saw the same activity and conditions that Price-Savannah observed. Despite personally observing those conditions and receiving Price-Savannah's repeated reports, the owner took no action to stop or reduce the prostitution and sex trafficking activity.

95.

Price-Savannah also observed a maintenance employee purchasing the women being sold for sex at the property. Price-Savannah repeatedly observed this employee entering rooms occupied by women she believed were being trafficked when no maintenance work was required. Price-Savannah also observed the same maintenance employee purchase drugs from individuals residing at the Travelodge. According to her, the employee was frequently impaired while on duty.

96.

The conditions at the Travelodge became so severe that Price-Savannah decided she could no longer continue working at the property. As she recalls, individuals associated with the prostitution and sex trafficking activity left used condoms on her vehicle as a form of intimidation or retaliation. Price-Savannah reported the

incident to the owners and informed them that conditions at the hotel had become intolerable and that changes needed to be made or she would resign. The owners took no corrective action. Shortly thereafter, Price-Savannah resigned from her position.

97.

During her tenure as general manager, Travelodge never provided Price-Savannah with any safety, security, or anti-sex trafficking training.

98.

T.E., whose declaration is attached to this Complaint,[4] was sold for sex at the Travelodge off and on between 2012 and 2015, beginning when she was only seventeen years old.

99.

T.E. observed pervasive drug and prostitution activity throughout the hotel. According to T.E., women and girls dressed in revealing clothing were regularly present on the property, and men frequently entered and exited their rooms after short visits throughout the day and night.

---

[4] *See* Ex. 2, T.E. Declaration.

100.

According to T.E., many of the girls being sold for sex appeared to be of middle-school or high-school age and routinely solicited buyers of sex on the Travelodge property.

101.

T.E. observed pimps waiting outside rooms while the women and girls they controlled were purchased for sex inside.

102.

According to T.E., some pimps maintained friendly relationships with front desk employees and certain pimps paid employees to act as lookouts. T.E. also observed hotel employees purchasing the women and girls being sold for sex at the Travelodge.

103.

The Travelodge permitted T.E. to pay part of the cost of a room, engage in commercial sex, and then pay the remaining balance of the room.

104.

According to T.E., the hotel's policy and practice was to not contact law enforcement regarding prostitution or drug activity.

105.

Ms. Davis, whose declaration is attached to this Complaint,[5] worked as an independent sex worker at the Travelodge in 2013. During that time, she observed numerous other women selling sex at the hotel and regularly soliciting buyers of sex in the surrounding area.

106.

Ms. Davis's room was on the back side of the Travelodge.

107.

The Travelodge was widely known in the area as a hot spot for prostitution. According to Ms. Davis, prostitution and drug activity were openly visible on a daily basis, and hotel employees were aware of those activities.

108.

Ms. Davis observed pimps renting rooms at the property, standing in doorways, and openly recruiting women to work for them.

109.

Ms. Davis witnessed violence against women occurring openly at the Travelodge. Once, she observed a man throw a naked, visibly beaten woman out of a hotel room and then throw her clothing outside. Ms. Davis heard the man tell the woman that because she had taken his money, she had to go make it on her own.

---

[5] *See* Ex. 3, Tiffany Davis Declaration.

110.

The Travelodge employed a security guard who regularly checked on the women being sold for sex at the hotel. According to Ms. Davis, the guard routinely visited the rooms occupied by women being sold for sex and was familiar with many of them.

111.

On August 4, 2014, Ms. Davis was brutally raped by a man who forced his way into her room demanding money. During the assault, the attacker bound Ms. Davis's wrists and ankles with the cord from her curling iron and wrapped her pants around her head. After learning of the assault, the Travelodge security guard visited Ms. Davis and spoke with her about the incident.

112.

Mr. Payton, whose declaration is attached to this Complaint,[6] worked as a security guard at the Travelodge for several months in 2013. His shift ran from approximately 8:00 p.m. to 5:00 a.m.

113.

Throughout his employment at the Travelodge, Payton observed what he describes as extensive prostitution and drug activity at the property. He became

[6] *See* Ex. 4, Willie Payton Declaration.

familiar with several women engaged in prostitution and was aware of at least one pimp operating from the hotel.

114.

According to Payton, the Travelodge was dangerous. On his first night, he intervened in an altercation involving two men and prevented the situation from escalating into a shooting.

115.

According to Payton, employees, including front desk and housekeeping staff, were aware that prostitution and drug activity occurred daily at the Travelodge. The activity was openly visible, and Payton never observed hotel personnel take meaningful steps to stop it.

116.

Payton regularly interacted with the front desk employee and her husband, both of whom lived and worked at the hotel. On multiple occasions, they asked Payton to perform tasks unrelated to security, including transporting laundry, because they were reluctant to leave the front office at night due to concerns about criminal activity at the hotel.

117.

Ultimately, Defendants terminated their security contract with Payton's employer because Payton was removing too many guests involved in prostitution and drug activity from the property, resulting in lost room revenue.

118.

Defendants provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why Plaintiffs' traffickers brought them to the Travelodge to be sold for child sex.

119.

The prostitution and sex trafficking activity occurred in the Travelodge's rooms, hallways, parking lot, exterior areas, and along the surrounding street. Girls and children being sold for sex were forced to solicit or wait for buyers outside; pimps, drug dealers, and sex buyers congregated around the property; and a continuous stream of visitors, sometimes up to one hundred per day, entered and exited the property to engage in commercial sex and other illegal activity.

120.

By permitting these conditions to persist for years, Defendants operated the Travelodge as a hub for prostitution and sex trafficking that attracted sex buyers, pimps, drug dealers, and others engaged in criminal activity to the property and surrounding area. The prostitution and sex trafficking at the Travelodge and the activity

it attracted generated substantial traffic, violence, and disturbances that resulted in prostitution, sex trafficking, and solicitation occurring in common areas, outside the hotel, and on the surrounding street.

121.

Thus, the effects of the prostitution and sex-trafficking nuisance Defendants permitted at the Travelodge reached the hotel's common areas, parking lot, exterior areas, and surrounding street, causing or contributing to an appreciable blighting effect on the surrounding community.

122.

The victims—girls and women—being trafficked for sex were harmed by the prostitution and sex trafficking nuisance at the Travelodge. They were sold for sex and beaten. Residents of the Travelodge were harmed by the constant presence of prostitution and sex trafficking in the place they were forced to reside. The surrounding community who encountered the crime, trauma, and acceptance of prostitution and sex trafficking at the Travelodge were harmed by witnessing and encountering that type of pervasive crime. It was "an environment that would be dangerous and unhealthy for anyone[.]" *Northfield Ins. Co. v. Northbrook Indus., Inc.*, 749 F. Supp. 3d 1325, 1338 (N.D. Ga. 2024), *appeal dismissed sub nom. Northfield Ins. Co. v. N. Brook Indus., Inc.*, 176 F.4th 1268 (11th Cir. 2026). Being kept "in a dangerous setting where prostitution, drugs, and weapons were ubiquitous" causes harm to

those who must live in, visit, and experience such a dangerous setting. *Id.* In short, everyone who encountered the sex trafficking nuisance at the Travelodge was harmed by it.

123.

Defendants had actual or constructive knowledge of the Travelodge's publicly available online reviews that reported prostitution and crime at the hotel, including the following (reproduced verbatim):

1. June 2010, from TripAdvisor:

    I really don't have a lot of time to elaborate, but we stayed here (room 128 – on the far side by the interstate/freeway) . . . prostitute and drug-dealer looking types seem to have a stake at this location.

2. October 2011, from TripAdvisor:

    we had "Ladies of the night" Prostitutes working the room next door it was a little unsavory.. my husband and I just ended up praying for those girls to come out of that life style.

3. September 2012, from TripAdvisor:

    I just stayed here Labor day weekend 2012. I read the reviews so I knew what I was getting into. This was booked as a package deal for my weekend events in Atlanta. . . . Believe the stories above having to leave your ID for an iron and the board. Believe about the hook-ers.

4. 2013, from Google:

    This hotel was very ghetto. People were fighting everyday, prosti-tutes.. . . .

5. June 2013, from TripAdvisor:

 They have prostitution around the hotel and drugs no one wants there kids around those kind of things just a horrible experience I would love to receive my money back seeing that I didn't even stay a full night

 On June 10, 2013, Jay H., Manager responded:

 Dear Sir/Madam, After renovating this location completely over the last one year from Lobby, breakfast area, parking lot to all rooms, it is very disappointing to hear a comment like this – we appreciate you bringing these issues to our attention and we will definitely address these issues you mentioned so your next visit with us become flawless. Please contact our on site manager Milinda Price to make your reservation in the future directly calling 404-477-1050

6. July 2013, from TripAdvisor:

 when entering the room we turned back the cover and there was a used condom at the head of the bed. then my mate dropped his phone and we pulled the mattress up to reach the phone and there was drug paraphernalia under the mattress with other condoms. there was a lot of traffic around the property. females standing outside the rooms with skimpy clothes on. it seems as if this location is for locals to live in weekly. very uncomfortable..beware…

7. 2014, from Google:

 This is the worst motel that I have ever stayed in. . . . There were people hanging around after dark and I was concerned about the security. There were people coming and going all night and a significant amount of disturbance that I felt was on the wrong side of the law.

8. May 2014, from TripAdvisor:

 This hotel obviously caters to drug dealers and prostitutes. All night people were hanging outside.A man asked me if had weed for him to buy, Another man was selling stuff he stole from a store.

9. May 2014, from TripAdvisor:

   Do not consider staying t this location. Drugs, Prostitutes, and extremely poor service.

10. December 2014, from TripAdvisor:

    Saw a used condom on the outside stairs leading to the 2nd floor.

11. 2015, from Google:

    Horrible, disgusting, ghettoish. I was afraid to stay there and get robbed or raped. Sketchy guys strolling around looking to jack somebody up. Disgusting. Excellent for a prostitution operation. Yuck.

12. 2015, from Google:

    RUNNNN!!! This is the worst hotel I have ever stayed in ever! I stayed here for a week for business and it was horrible. First there are Trannys and prostitutes who literally stand outside with their hotel doors open giving their customers directions . . . the College Park police presence is met with disappearing acts then the drug dealers, prostitutes, and thieves are back in business.

13. May 2015, from TripAdvisor:

    Do not stay at Travelodge College Park Ga!!!!!! There appeared to be hookers working the rooms. There appeared to be drug transactions taking place. And there appeared to be homeless families with children living there. We saw a school bus pick up and drop off children in the driveway.

14. June 2015, from TripAdvisor:

    This place is horrible. Prostitutes everywhere.

15. August 2015, from TripAdvisor:

    Lots of prostitution going on at this establishment. . . . We were woken up at night with sounds of loud music, fighting, etc.

16. <u>August 2015, from TripAdvisor:</u>

> Don't even think of staying there…trashy area along with prostitutes and nothing good about the inside of the room either . . .

17. <u>September 2015, from TripAdvisor:</u>

> I would strongly recommend against staying at this facility unless you are trying to hide from the police as they are very busy there dealing with the street thugs and drug vendors that frequented the parking lot. I personally watched two drug deals go down on the south side of the building.

18. <u>February 2016, from TripAdvisor:</u>

> When I checked into my room I opened the drawer and found a Magnum condom box with 2 used condoms inside.

124.

Defendants knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

125.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Travelodge. Much of this activity either did alert or should have alerted Defendants to the hotel's rampant sex trafficking, prostitution, and sex crime problem.

126.

Denine Brand, whose declaration is attached to this Complaint,[7] was a resident of the Travelodge for about six months. She lived at the Travelodge with her daughter who was fifteen years old at the time.

127.

During her time residing at the Travelodge, she learned that a maintenance employee, Travis Johnson, was on parole at the time he was employed at the Travelodge.

128.

Ms. Brand learned that Mr. Johnson had been accused by Ms. Brand's fifteen-year-old daughter of inappropriate contact and of showing her his genitals. Mr. Johnson was questioned and eventually admitted to his behavior. Mr. Johnson went to prison and reoffended by committing child molestation in 2022.

129.

Ms. Brand described that it was well known by everyone at the hotel, including employees, that drug and prostitution activity was going on every day. Ms. Brand knew that there were prostitutes because the makeup, clothing, demeanor, and activity was that of a prostitute. She also witnessed many men from the streets coming and going from these rooms, and that the maintenance workers visited these rooms

---

[7] *See* Ex. 5, Denine Brand Declaration.

a lot. Ms. Brand noticed that there were a lot of drug sales and use at the hotel, and the hotel staff seemed very friendly with these particular tenants.

130.

Following this event, Ms. Brand was told by management when she went to pay rent that she could no longer stay at the Travelodge and that she had to move out.

131.

R.E., whose declaration is attached to this Complaint,[8] is the grandmother of a minor who was trafficked at the Travelodge. Her trafficker was eventually arrested at the Travelodge.

132.

R.E. went to the Travelodge to look for her granddaughter. When she spoke to a front desk employee, the employee said she had seen R.E.'s granddaughter and rented rooms to her granddaughter's pimp. The employee told R.E. she knew R.E.'s granddaughter was being forced to sell sex by her pimp.

133.

Each time R.E. went to the Travelodge, it looked like an open market for sex with lots of young girls and women wearing little clothing and trying to pick up men for sex. Some of these girls looked like they were still in middle school.

---

[8] *See* Ex. 6, R.E. Declaration.

134.

Defendants and their employees knew or should have known that obvious sex trafficking, including Plaintiffs' sex trafficking, was occurring at their property, at times with the assistance of their employees.

135.

Despite the dangerous, illegal, and criminal activity surrounding the property, Defendants negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

136.

Despite having actual or constructive knowledge of this illegal activity, Defendants negligently failed to take reasonable steps to stop such illegal and dangerous activity from occurring, including that involving their own employees.

137.

Additionally, Defendants negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

138.

Defendants also negligently failed to supervise their employees to ensure the hotel was not facilitating sex trafficking or participating in sex trafficking through the business of the hotel, as was the case with Plaintiffs' trafficking.

139.

Defendants also negligently failed to provide reasonable, uniform staff training on responding to criminal activity at the property, including how to coordinate with law enforcement, assess the nature and cause of reported crime, and use that information to deter or prevent future criminal activity.

140.

Defendants also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

141.

Defendants knew or should have known that they were permitting the hotel to be used as a place of prostitution and sex trafficking.

**V. Defendants' knowledge of sex trafficking generally.**

142.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than twenty years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

143.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Travelodge. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.[9] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiffs.

[9] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* ATLANTA JOURNAL-CONSTITUTION (Mar. 13, 2014), https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/; *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* at 30-32*,* URBAN INSTITUTE, (March 12, 2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities.

144.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[10] and as "the number one city for child sex trafficking."[11]

145.

Defendants knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

146.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and

---

[10] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* U.S. DEP'T OF JUSTICE (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department.

[11] *Id.*

another 2.6 percent reported a combination of sex and labor trafficking.[12] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[13] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[14] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[15]

147.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[16] and that the industry had been

---

[12] NATIONAL HUMAN TRAFFICKING HOTLINE, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited May 19, 2026).

[13] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[14] Brittany Anthony, et al. *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* at 16, POLARIS PROJECT (July 2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf.

[15] *Id.* at 23.

[16] Rich Keating, Human Trafficking: What Is it and How It Impacts the Hospitality Industry at 6, address at the AHIA Sprint Conference 2013 (slide deck available at https://perma.cc/X5DG-YQ3M).

warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[17]

148.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[18]

149.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a) establish corporate policy and procedures against sexual exploitation of children;

(b) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

---

the AHIA Sprint Conference 2013

[17] *Id.* at 19.

[18] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited May 19, 2026).

(c) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f) report annually on the company's implementation of Code-related activities.

150.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

151.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

(f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) extended stay with few or no personal possessions in the room;

(h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i) the same person reserves multiple rooms;

(j) a room is rented hourly, less than a day, or for an atypical extended stay;

(k) attempts to sell items to or beg from patrons or staff;

(l) cars in the parking lot regularly parked backward, so the license plates are not visible;

(m) loitering and solicitation of male patrons;

(n) waiting at a table or bar and picked up by a male (trafficker or customer);

(o) persons asking staff or patrons for food or money; and

(p) persons taking cash or receipts left on tables.

152.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiffs' case, the Travelodge, for a fee, provided this market for Plaintiffs to be confined and sold.

**COUNT I**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**
**(PLAINTIFFS D.H. & R.O.)**

153.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

154.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefited from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

155.

Defendants knowingly benefited from Plaintiffs' sex trafficking by receiving revenue generated by the operation of the Travelodge, including the revenue generated for the room in which Plaintiffs were trafficked. Each day Plaintiffs were trafficked at the Travelodge, Defendants knowingly benefited by receiving money from Plaintiffs' trafficking in the form of room-rental fees.

156.

Defendants participated in a hotel venture and knew or should have known that their operation of the Travelodge violated the TVPRA by harboring and falsely imprisoning Plaintiffs so that they could be sold for sex at the hotel. Defendants also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiffs' sex traffickers to harbor, falsely imprison, and traffic Plaintiffs at the Travelodge.

157.

The venture in which Defendants participated was in or affecting interstate commerce.

158.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiffs' child sex trafficking at the Travelodge. Defendants knew or should have known of this participation.

159.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Travelodge.

160.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

161.

Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

162.

Defendants are liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

163.

Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs, whose damages were proximately caused by the acts discussed in this count.

## COUNT II
## STATUTORY LIABILITY: MASHA'S LAW
## 18 U.S.C. § 2255
## (PLAINTIFFS D.H. & R.O.)

164.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

165.

Plaintiffs were under the age of 18 when they were trafficked at the Travelodge.

166.

Plaintiffs were victims of violations of 18 U.S.C. § 1591 at the Travelodge.

167.

As described herein and specifically in paragraphs 34–141, Defendants knowingly benefited from participating in a venture that they knew or should have known engaged in an act of sex trafficking at the Travelodge, including the harboring and other trafficking activities which harmed Plaintiffs.

168.

Plaintiffs suffered injuries as a result of Defendants' violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

169.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiffs for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT III**
**NUISANCE**
**(PLAINTIFFS B.C., D.H., & R.O.)**

170.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

171.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

172.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

173.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

174.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building,

structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

175.

The Travelodge's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

176.

The Travelodge caused or contributed to a blighting effect on the surrounding community, so that the Travelodge negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Trave-lodge, although the effects on each person may have varied.

177.

The illegal prostitution and sex trafficking nuisances occurring at the Trave-lodge had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraging idleness, loitering, vagrancy, and having a tendency to breed crime and debauch the morals of the community.

178.

The acts and omissions of Defendants in permitting prostitution and sex

trafficking at the Travelodge caused special damages to Plaintiffs, as they were the victims of child sex trafficking at Defendants' nuisance hotel and suffered damages to their health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiffs for all such damages.

**Public Nuisance Per Se**

179.

The Travelodge constituted a statutory nuisance per se under Georgia law because Defendants knowingly and/or negligently turned a blind eye and permitted illegal sexually related crimes to occur at the Travelodge, including sex trafficking.

180.

A business where illegal practices are permitted constitutes a nuisance.

181.

A business, like the Travelodge, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

182.

Plaintiffs were directly harmed as a result of the sex crime nuisance at the Travelodge that permitted illegal sexual activity to occur there.

183.

Defendants are liable for nuisance (public nuisance and/or per se public

nuisance) by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiffs were direct victims of such activity.

## DAMAGES

184.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

185.

As a proximate and foreseeable result of Defendants' violations of the TVPRA and Georgia law, Plaintiffs sustained physical injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incidents at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiffs seek all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a) Physical injuries;

(b) Past, present, and future conscious pain and suffering;

(c) Loss of enjoyment of life;

(d) Mental anguish and emotional distress;

(e) Incidental expenses;

(f) All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

(g) Consequential damages to be proven at trial.

186.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

187.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68, and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendants for the following:

(a) Process issue as provided by law;

(b) Plaintiffs be awarded actual damages in amounts to be shown at trial from Defendants;

(c) Plaintiffs be awarded all general, special, compensatory, economic, consequential, punitive, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

(d) Plaintiffs be awarded a trial by jury; and

(e) Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on October 16, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381

jwebster@atclawfirm.com
RORY A. WEEKS
Georgia Bar No. 113491
rweeks@atclawfirm.com
CAROLINE M. CAPPS
Georgia Bar No. 645599
ccapps@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

LAW & MORAN

*/s/ Denise D. Hoying*
PETER A. LAW
Georgia Bar No. 439655
pete@lawmoran.com
E. MICHAEL MORAN
Georgia Bar No. 521602
mike@lawmoran.com
DENISE D. HOYING
Georgia Bar No. 236494
denise@lawmoran.com

563 Spring Street, NW
Atlanta, Georgia 30308
(404) 814-3700 | Telephone
(404) 842-7710 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile